UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

YVONNE RICHARDS-BYERS,

                                                    Plaintiff,

                      -against-

THE NEW YORK CITY DEPARTMENT OF FINANCE
and THE CITY OF NEW YORK,

                                                    Defendants.

-------------------------------------------------------------------- x

**DEFENDANTS' STATEMENT
OF UNDISPUTED MATERIAL
FACTS PURSUANT TO
LOCAL CIVIL RULE 56.1**

Docket No. 05 Civ. 8486 (GBD)

          Pursuant to Local Civil Rule 56.1 of the United States District Court for the
Southern District of New York, defendant the New York City Department of Finance ( "DOF")
and the City of New York ("City") (collectively referred to herein as "defendants"), submit this
Statement of Undisputed Material Facts as to which there are no genuine issues to be tried:

          1.          Plaintiff Yvonne Richards-Byers ("plaintiff"), an employee of DOF,
alleges that defendant DOF retaliated against her and harassed her because she provided
testimony in support of a co-worker's harassment claim against a DOF supervisor, in violation of
Title VII.  See Exhibit "A."[1]    Plaintiff claims that as a result of her testimony, a co-worker
harassed her and the DOF reassigned her, subjected her to *de facto* demotions and failed to
promote her.  Id. at ¶¶ 14, 37, 38.

**A.      Background**

---

[1] Unless otherwise indicated, all exhibits and declarations cited to herein refer to those exhibits
and declarations annexed to the Declaration of Camille D. Barnett, dated October 29, 2008, and
submitted herewith.

2.       In September 1996, plaintiff was hired by DOF as a Clerical Associate in the Parking Violations department.  See Exhibit "A"; see also Exhibit "B" at 24: 22-24; 25: 4-7. On June 19, 2000, plaintiff was appointed from a Civil Service list for the position of Principal Administrative Associate I ("PAA I").  See Exhibit "B" at 22: 16-19; see also Exhibit "C."   As a PAA Level I in parking violations unit of DOF, plaintiff testified that her job duties were that of "like office manager secretary" in a small office of about nine people.  See Exhibit "B" at 25: 10-12.  Specifically, PAAs utilize manual and automated office systems and encompasses responsible office, supervisory or administrative work of varying degrees of difficulty and with varying degrees of latitude for independent initiative and judgment.  See Exhibit "D."   All personnel perform related work and when necessary perform the duties of lower titles and Assignment Levels.  Id.  PAA Is perform difficult and responsible administrative or management work, including work related to budgeting and work that is required for the conduct of hearings, control processing, and integrity of dispositions of parking violations.  Id.

3.       In parking violations, plaintiff was supervised by Harold Klinger.  See Exhibit "B" at 25: 13-14.  Plaintiff testified that she "got along very well together" with her supervisor, Mr. Klinger.  See Exhibit "B" at 26: 11-14.  Plaintiff did not supervise any employees.  See Exhibit "B" at 25: 17-18.

4.       From 1997 to 2006, Michael King was an Associate Analyst in the parking violations unit within the DOF.  See Exhibit "E" at 14: 21-25; 15: 1-5; 16: 24-25; 17: 2. Mr. King never supervised plaintiff, had no power to affect plaintiff's job title, duties, salary or responsibilities as plaintiff was supervised by Mr. Klinger.  See Exhibit "E" at 63:17-25; 64:1-5.

**B.     Plaintiff Had A Confidential Interview With DOF's EEO Office Concerning A Complaint Filed By Another DOF Employee.**

5.      DOF's Director of the Equal Employment Opportunity ("EEO") Office Annie Long testified in her deposition that Ms. Tanya Hayes filed a sexual harassment complaint against Michael King in June 2002. See Exhibit "F" at 27: 16-25, 28:1-5; see also Exhibit "G." Ms. Hayes had issues with timekeeping/timesheets and other personal issues. See Exhibit "___" at 35: 4-8. Mr. King did not supervise plaintiff. See Exhibit "E" at 63: 17-19.

6.      Director Long received Ms. Hayes' list of witnesses and set up appointments with these individuals. See Exhibit "F" at 35: 9-13. Plaintiff was one of the listed witnesses and Director Long interviewed plaintiff in connection with Ms. Hayes' complaint. See Exhibit "A" at ¶ 12; see also Exhibit "F" at 35: 15-18, 41: 16-19.

7.      Specifically, on August 6, 2002, plaintiff had a confidential interview with Director Long, concerning the internal EEO complaint filed by Ms. Hayes. See Exhibit "B" at 31: 5-6; see also Exhibit "F" at 41: 16-19.

8.      Plaintiff was advised by Director Long that the conversation was confidential and plaintiff did not believe that Director Long told anyone about the meeting. See Exhibit "B" at 31: 15-20.

9.      Plaintiff admitted that no DOF employee ever told her that they knew that she had spoken to EEO Office. See Exhibit "B" at 36: 4-6.

10.      Plaintiff speculated that Michael King knew that she spoke to the EEO office concerning Ms. Hayes' complaint because he must have seen that she was helping Ms. Hayes. See Exhibit "B" at 31:21-25; 32: at 1. Specifically, plaintiff testified that she helped Ms. Hayes by doing her Absence Control report, which she believed had been improperly done by Ms. Hayes' supervisor, Mr. King. See Exhibit "B" at 33: 21-25; 34: 1-6. An Absence Control report is a periodic report of an employee's annual leave and sick time. See Exhibit "B" at 27: 5-

12; 33: 22-25; 34: 1-4.  Director Long testified that plaintiff was Ms. Hayes' witness concerning

the issues related to the absence control reports.  See Exhibit "F" at 40: 25; 41: at 1-4; 42: 1-5.

      11.    Plaintiff testified that Ms. Hayes never spoke about her EEO complaint

when she visited her desk.  See Exhibit "B" at 32: 16-18.

### (a) Neither Mr. King Or Ms. Byer Were Aware That Plaintiff Testified Or Assisted In The Internal EEO Complaint Of Tanya Hayes.

      12.    Mr. King denied the allegations of sexual harassment of Tanya Hayes.

See Exhibit "E" at 23: 11-19.  Mr. King was interviewed by EEO Director Long.  See Exhibit

"E" at 22: 18-25; 23: 1-19; see also Exhibit "F" at 38: 9-14.  Director Long advised him that she

would conduct additional interviews but she did not say of whom.  See Exhibit "E" at 39: 4-16.

Director Long testified that Mr. King did not know who Ms. Hayes listed as witnesses.  See

Exhibit "F" at 41: 16-19.

      13.    In August 2002, Ms. Hayes was transferred and Mr. King no longer spoke

to or supervised her.  See Exhibit "B" at 35: 13; see also Exhibit "E" at 44: 11-19.

      14.    Mr. King testified that he did not know whether plaintiff supported Ms.

Hayes' complaint, nor was he aware of any relationship between plaintiff and Ms. Hayes as he

sat on the opposite side of the office from plaintiff and had no knowledge of any friendship or

relationship between the two.  See Exhibit "E" at 41: 14-17, 42: 9-21.

      15.    Mr. King did not recall ever telling Ms. Byer about the EEO complaint

against him or talking to her about it and described his relationship with Ms. Byer as "cordial,"

noting that they sat at opposite sides of the office.  See Exhibit "E" at 48: 5-16; 49: 21-2351: 9-

17.

      16.    Mr. King testified that he could not recall discussing plaintiff with

Glendora Byer and never asked Ms. Byer to take any action concerning plaintiff, nor was he

aware of any problem between plaintiff and Ms. Byer. See Exhibit "E" at 47:24-25; 50: 1-13, 24-25; 51:9-12, 25; 52:1-4.

17.    Mr. King testified that he never supervised plaintiff and had no power or authority to affect her job title, job duties, job responsibilities or salary. See Exhibit "E" 63: at 17-25; 64: 1-12.  He was not involved in plaintiff's transfer in any way and noted that while plaintiff's transfer occurred in September 2003, he was no longer working in that office (Parking Violations)  as of October 2002 as he was then assigned to work at a DOF facility located at 66 John Street.  See Exhibit "E" at 64: 6-12.

18.    Mr. King was eventually advised by Director Long in early 2003, that the charges were deemed "unfounded."  See Exhibit "F" at 36:1-8; see also, Exhibit "E" at 38: 1-6 and Exhibit "H."

19.    Glendora Byer, an Office Associate in the Parking Violations unit, testified that she first learned of Ms. Hayes' internal EEO complaint against Mr. King sometime in 2002 or 2003, through office rumors.  See Exhibit "I" at 22: 7-25; 23: 1-5.  Ms. Byer believed that Mr. King confirmed the rumors to her at some point but that she and Mr. King did not have a close relationship where they would have discussed the allegations.  See Exhibit "I" at 23: 18-25; 24: 1-14; 26: at 5-18.  Ms. Byer did not meet with EEO Director Long concerning Ms. Hayes' complaint. See Exhibit "I" at 28: 5-20.

20.    Ms. Byer testified that she did not learn that plaintiff assisted Ms. Hayes in her EEO complaint or had been interviewed by Ms. Long until February 2007, shortly before she was deposed in this lawsuit.  See Exhibit "I" at 28: 5-20; 30: 5-25.

21.    Ms. Byer testified that she never witnessed plaintiff helping Ms. Hayes with her complaint or assisting her in the workplace and had no knowledge of any non-working

relationship between the women.  See Exhibit "I" at 22: 17-25; 23: 1-5; 34:8-25; 35:1-4.  Ms.

Byer also testified that plaintiff was never discussed in any conversation with Mr. King.  See

Exhibit "I" at 38: 14-21.

       22.    In her deposition, Ms. Byer testified that she did not know if DOF's EEO

office conducted an investigation into the allegation against Mr. King, nor did she know if the

EEO office interviewed anyone concerning the allegations.  See Exhibit "I" at 33: 7-16.  Ms.

Byer believed that the complaint against Mr. King was thrown out because he continued to

work in the office, although she never discussed it with Mr. King or Ms. Hayes.  See Exhibit

"I" at 32: 22-25; 33: 1-6.

## C.    Plaintiff's Complaints Of Harassment By Co-Worker Glendora Byer

       23.    Plaintiff believes that she was retaliated against for helping her co-worker

with an internal EEO complaint.  See Exhibit "B" at 100: at 4-7.  Plaintiff alleges that following

her testimony with the EEO office, Ms. Byer began harassing her.  See Exhibit "A."

       24.    Plaintiff testified that her work environment changed after her confidential

interview with the EEO office.  See Exhibit "B" at 37: 7-9.  Plaintiff complained that Ms. Byer

began having "loud conversations" and popping gum around her office, which seemed to occur

when plaintiff was on the phone or conversing with another employee.  See Exhibit "B" at 37: 7-

18.  Additionally, plaintiff stated that after her EEO interview, Ms. Byer no longer gave her the

supplies she requested.  See Exhibit "B" at 38: 20-22.

       25.    Plaintiff testified that in September 2002, following her confidential EEO

interview, plaintiff complained to Mr. Klinger, her supervisor, about the gum popping of

Glendora Byer.  See Exhibit "I" at 8: 19-20.  Plaintiff testified that Ms. Byer said that the reason

she was popping her gum was because plaintiff was humming to music.  See Exhibit "B" at 43:

at 15-22.  Plaintiff also asserts that she asked her supervisor to change her desk but her

supervisor suggested that she first speak to Ms. Byer.  See Exhibit "B" at 43: 24-25; 44: 1; see also Exhibit "J" and Exhibit "K."  Plaintiff refused to do so as she believed that Ms. Byer's behavior was "deliberate."  See Exhibit "B" at 44: 2-3, 9-10.

26.    In a written complaint, dated November 1, 2002, concerning Ms. Byer, plaintiff did not state that Ms. Byer's alleged harassment was the result of her EEO testimony or in any way connected with the EEO complaint of Ms. Hayes against Mr. King.  See Exhibit "J."

27.    In November 2002, Plaintiff also went to DOF's disciplinary unit to complain about Ms. Byer's behavior and a back and forth incident with Ms. Byer regarding the alleged unlocking of an office door.  See Exhibit "B" at 44: 12-17.  Plaintiff was told that Ms. Byer's supervisor, Ms. Liz Gacek, would be notified but plaintiff opined that as plaintiff's supervisor, Ms. Gacek would be biased because she was Ms. Byer's supervisor.  Id. at 21-22. Plaintiff went on to mention that Ms. Gacek had made a statement to her in the past that was "inappropriate" and "on the verge of sexual harassment."  See Exhibit "B" at 44: 21-25.  When it was suggested that plaintiff file a complaint against Ms. Gacek, plaintiff refused to file a complaint against her and insisted on filing a complaint against Ms. Byer.  See Exhibit "B" 44: at 22-25; 45: at 1-2.  Plaintiff was told that she could not be helped.  Id. at 2.

28.    Plaintiff's supervisor, Mr. Klinger, sent plaintiff an e-mail on November 21, 2002, which references plaintiff's e-mail of November 1, 2002.  See Exhibit "K."  Mr. Klinger stated that he did not refuse plaintiff's request to change her work location but rather suggested that the best resolution could be achieved if plaintiff first speak to Ms. Byer about her complaints.  Id.

29.    Ms. Byer, stated that she did not work with plaintiff, although plaintiff sat right outside her office.  See Exhibit "I" at 40: 11-24.  Ms. Byer testified that she believed that

she did crack her gum but denied any retaliatory motive or that Mr. King asked her to treat plaintiff in a particular way.  See Exhibit "I" 48: at 5-13; 49: at 6-19.

30.    Ms. Byer never supervised plaintiff and did not have the authority or power to affect plaintiff's job responsibilities, duties or any transfer.   See Exhibit "I" at 59: 22-25; 60: 1-13.

31.    On the day of the New York City blackout, in August 2003, plaintiff claims that as employees were leaving the building, Ms. Byer turned off a flashlight as soon as she began to go down the stairs.  See Exhibit "B" at 41:1-5.  Plaintiff also claimed that on or about January 3, 2003, Ms. Byer threw out survey forms which she was required to hand out to borough offices because Ms. Byer claimed that she did not know who the forms belonged to. See Exhibit "B" at 41: 17-25; 42: 1-4.  Plaintiff believed that Ms. Byer's behavior was related to her EEO interview because Ms. Byer never did such things before.  See Exhibit "B" at 39: 4-7.

32.    Plaintiff contends that Mr. King and Ms. Byer were good friends and complained that after her EEO interview, Mr. King no longer spoke to her, would roll his eyes at her and gave her "looks" and would close the door when speaking to Ms. Byer.  See Exhibit "B" at 39: 17-24.

33.    Plaintiff also contends that her work was changed as a result of her confidential EEO interview.  See Exhibit "B" at 58: 18-24.  In particular, plaintiff complained that she was not given a new City green book, which provides a list of city telephone numbers. Id. at 61: 21-25.  Plaintiff also complained that she no longer received the absence control calendars. Id. at 61: 8-12.

34.    In December 2002, plaintiff went to the New York City Human Rights Commission and complained that she was being retaliated against and harassed after testifying

for someone at an EEO hearing.  See Exhibit "B" at 49:13-25.  Plaintiff testified that she was advised that she could not be helped purportedly because her complaint was "a year ago." Id. Plaintiff testified that the person at NYC Human Rights Commission believed that she had wanted to file a complaint about Ms. Gacek and a statement made by Ms. Gacek over a year ago. See Exhibit "B" at 50: 3-25.

35.    Records from the City Commission of Human Rights note that while visited  it's office on March 6, 2003, a complaint was never filed.  See Exhibit "L."  Plaintiff recounted her complaints concerning the alleged comments made by Ms. Gacek as well as her complaints concerning Ms. Byer.  Id.  The City Commission concluded that the alleged sexual harassment statement purportedly made by Ms. Gacek occurred more than one year ago.  Id. at p. 3.  The retaliation claim was said to be "too attenuated to be credible."  The City Commission concluded that the case concerned harassment, which is not covered by the Human Rights Law. Id.  As such, no formal complaint was filed.  Id.

36.    Although plaintiff did mention alleged retaliation for her involvement in an internal EEO of a co-worker, plaintiff also speculated that Ms. Byer was harassing her in retaliation for plaintiff's complaints to Ms. Gacek about Ms. Byer talking too loudly.  See Exhibit "L" at p.2.

37.    Plaintiff testified about another incident in June 2003 in which her annual leave balance slip was missing.  See Exhibit "B" at 51:20-21; see also Exhibit "SDHR COMPT." Plaintiff claimed to have seen a Ms. Shepard, who worked for Ms. Gacek, separating the slips and then make a phone call to Ms. Byer, although plaintiff did not overhear the conversation. See Exhibit "B" at 51: 20-25; 52: at 1, 12-13.  Plaintiff stated that Ms. Byer went into Ms. Shepard's office and gestured as if she was reading her time balance clip.  See Exhibit "B" at 52:

2-5.  Plaintiff then went on vacation and asked for her pay stub but Lenore did not have it.  Id. at

52:5-7.  Plaintiff then e-mailed Ms. Gacek who told her that her supervisor had it.  See Exhibit

"B" 53: 13-14.  Plaintiff's supervisor said that he did not have plaintiff's or his own.  Id. at 53:16-

18.  When plaintiff went back to Ms. Gacek, she said that it must have been lost and got another

one from personnel.  Id. at 53:18-21.  Plaintiff believed that Ms. Byer destroyed her balance slip.

Id. at 53:24-25.

       38.     Plaintiff concedes that she was able to secure another balance slip from

Personnel.  See Exhibit "B" at 53:18-21.

       39.     On July 3, 2003, plaintiff complained to the New York City Department of

Investigation ("DOI") about retaliation by Ms. Byer for plaintiff's EEO testimony and about her

missing balance slip.  See Exhibit "B" at 54: 7-16.  DOI told plaintiff that they could not help her

with the missing balance slip but if personnel documents were not kept confidential, an

investigation would be made.  Id. at 54:16-18.

       40.     Plaintiff asserted that when she contacted DOI, they had no record of her

complaint.  See Exhibit "M"; see also Exhibit "N."

**D.**    **Plaintiff's Transfer To Other DOF Divisions More Than One Year After Her**
        **Confidential EEO Interview Fails To Establish A Causal Nexus To Support A**
        **Retaliation Claim.**

       41.     On August 22, 2003, plaintiff received a letter stating that she was being

transferred to the City Register Division effective September 8, 2003.  See Exhibit "B" at 55: 1-

2; see also Exhibit "O."

       42.     Plaintiff was transferred to the City Register which is under the Property

Division at the DOF.  See Exhibit "B" at 55: 17-18.  Plaintiff testified that she was advised that

the reason for her transfer was due to the new Commissioner's transition, and noted that when

Commissioner Martha Stark came in, she moved DOF units around.  Id. at 19-24.  Plaintiff did

not know if other DOF employees in her unit were also transferred.  <u>See</u> Exhibit "B" 56: at 13-17.  Commissioner Stark announced broad reorganization plans, consolidation of various functions and mergers of various departments.  <u>See</u> Exhibit "P."

       43.     Plaintiff believes that her transfer was related to her DOI complaint, because she "was demoted."  <u>See</u> Exhibit "B" at 55: 3-5; see also Exhibit "N."  The reason why plaintiff believed that her transfer was related to her DOI complaint only was because she was later transferred.  <u>See</u> Exhibit "B" at 55: 11-15.

       44.     EEO Director Long informed that on September 3, 2003, plaintiff came to her office and mentioned that she was being transferred.  She also complained about Ms Byer and Ms. Gacek.  <u>See</u> Exhibit "F" At 47: 1-7; <u>see</u> <u>also</u> Exhibit "N."   Notes from plaintiff's visit with Director Long indicate that plaintiff stated that she was being harassed by Ms. Byer by her not locking the office door in the evening and during the blackout when Ms. Byer allegedly turned off a flashlight as plaintiff was going down the stairs.  <u>See</u> Exhibit "F" at 52: 18-24; <u>see</u> <u>also</u> Exhibit 'N." Plaintiff also complained that Ms. Gacek was biased against her because of prior sexual harassment statements she had made to plaintiff.  <u>See</u> Exhibit "N." When Director Long asked her the dates of the alleges sexual harassment statements by Ms. Gacek, plaintiff replied, "a year and a half to 2 years."  <u>Id</u>.  Director Long advised plaintiff that she could only go back 12 months.  <u>Id</u>.

       45.     Plaintiff testified that she thought that she was being harassed because she contacted the New York City Department of Investigation ("DOI").  <u>See</u> Exhibit "F" 60: at 14-25.  When Director Long asked why Ms. Byer was harassing her, plaintiff responded "I really don't know.  <u>See</u> Exhibit "N." She's friends with Liz Gacek who doesn't like me."  <u>Id</u>.

46.     Plaintiff did go on to say that Ms. Gacek was "picking on her" because of her participation in the EEO investigation concerning Tanya Hayes.  <u>See</u> Exhibit "N." Moreover, when plaintiff mentioned Ms. Gacek and plaintiff's prior EEO interview, Ms. Long asked plaintiff how Ms. Gacek would know about the confidential EEO interview, plaintiff did not know.  <u>See</u> Exhibit "F" at 58: 23-25; 59: at 17; <u>see also</u> Exhibit "N." . When Director Long asked if Ms. Gacek ever mentioned the EEO investigation, plaintiff responded, "no."  <u>See</u> Exhibit "N."

47.     Plaintiff stated that she welcomed her transfer but just wanted to make sure it's done fairly and not because of harassment.  <u>Id</u>.

48.     Plaintiff was nonetheless given an EEO complaint and told to submit it if she came up with any supporting evidence of harassment.  Plaintiff took the form and stated that she wanted to think about it some more.  Plaintiff did not contact the EEO office concerning the filing of a complaint.  <u>Id</u>.

49.     When plaintiff was notified about her transfer in August 2003, plaintiff complained to her union about Ms. Byer's behavior but was told that since her complaint did not involve the union's employment contract, the Union could not help her.  <u>See</u> Exhibit "B" at 51: 5-18.

**(a) Plaintiff's Transfers Were Not An Adverse Employment Action.**

50.     Following the transfer on September 8, 2003, plaintiff's title remained PAA 1 and her salary did not change.  <u>See</u> Exhibit "B" at 65: 4-8.  Plaintiff's job duties included examining property related documents to check for errors.  <u>See</u> Exhibit "B" at 65: 9-17; <u>see also</u> Exhibit "Q." Plaintiff testified that on her first day, a DOF employee showed her how to properly use the computer and also showed her where to looks for errors on the documents.  <u>See</u> Exhibit "B" at 65: 19-23.  Plaintiff testified that she "caught on."  <u>See</u> Exhibit "B" at 65: 19-23.

Plaintiff was not aware if any DOF employees working with the City Register division received any training. See Exhibit "B" at 68: 4-8.

51.      Plaintiff testified that she believed that her transfer was a demotion because one month after working at her new location, she was called into the office and told that "she was not keeping up like everybody", because she felt like she was not trained and because her superior indicated that he would not sign off on sick leave. See Exhibit "B" at 69: 6-17. Plaintiff testified that when she got there, people were telling her that she cannot take off for sick leave because the division was "backed up" and leave time, sick or otherwise was not being granted to the entire unit. See Exhibit "B" at 66: 15-21.  Plaintiff did not know if other employees in the division were granted leave time. See Exhibit "B" at 66: 22-25.

52.      Plaintiff also believed that her transfer to the City Register division was a demotion because this division did not have "flex" time as some other DOF divisions allegedly do, although plaintiff acknowledged that no one else at the City Register had flex time. See Exhibit "B" at 74: 24-25; 75: 3-7, 17-18.

53.      On December 15, 2003 plaintiff visited EEO Director Long to complain about a transfer to the City Register as being in retaliation for her prior confidential interview with EEO and to request a reasonable accommodation.  See Exhibit "F" at 97: 19-25; 98: 1-5, 16-25; 99: 1-11; 108: 19-23.    Director Long testified that plaintiff could not state how her transfer related to her confidential interview. See Exhibit "F" at 107: 3-11.  Concerning any complaints plaintiff may have had that the City Register did not have flex time, Director Long explained that all DOF units do not have flex time. See Exhibit "F"  101: 6-19.

54.    Flex time is where an employee could come in a half hour later than their normal start time but would have to stay later in the evening to ensure that they completed a full day of work. See Exhibit "F" at 101: 24-25; 102: 1-16.

55.    During their conversation, plaintiff mentioned an accommodation and Ms. Long gave her a form to request an accommodation but she never submitted the necessary medical documentation. See Exhibit "F" at 107: 12-18; 108: 2-6.

56.    In January 2004, plaintiff was advised by Annette Hill, then Acting City Register that she would be transferred. See Exhibit "B" at 76: 15-16, 19-21; 78: 5-9. Plaintiff testified that she was advised that her numbers were low, there was mention that she was unhappy and that the agency needed someone in Manhattan, so she would be transferred. See Exhibit "B" at 76: 16-21.

57.    Plaintiff complained about the transfer to her union and was told that as long as she was getting the same salary, there was no demotion. See Exhibit "B" 79: at 15-18.

58.    Plaintiff's transfer was effective in March 2004. See Exhibit "B" at  81: 7-8. Again, plaintiff's PAA I title and salary remained the same. See Exhibit "B" at 80: 17-20. Plaintiff was assigned to another DOF City Register office in Manhattan. See Exhibit "B" at 80: 6-9. She was assigned to work on the telephone hot line to assist people who are trying to prepare deeds or send other property related documents to the City Register for recording. See Exhibit "B" at 80: 10-16; see also Exhibit "R.". Plaintiff liked her new assignment and felt that she was adequately trained. See Exhibit "B" at 80: 8-22. But plaintiff also testified that she felt that her transfer was a demotion because she claimed that her supervisor's title was "below" hers and that her co-workers did not seem to grasp the job as quickly as she did. See Exhibit "B" at 83: 17-23.

- 14 -

59.     Annette Hill acknowledged that plaintiff's transfer to Manhattan on or about February 2, 2004 was due to a need for an additional person to work on the helpline and the belief that plaintiff's abilities were well suited to answering inquiries from the public.  See Exhibit "S".  Plaintiff received the same training handouts as other employees, although there was no formal training at the City Register's Office.  Ms. Hill acknowledged that she had no prior knowledge of plaintiff's participation in any protected activities.  Id.

60.     Plaintiff's new supervisor was Laura Salaman, a Research Assistant, who plaintiff claims was a title lower than PAA I.  See Exhibit "B" at 79: 22-25; 80: 1-3.  Director Long testified that it does happen that someone may be supervised by someone with a lesser title.  See Exhibit "F" at 103: 22-25; 106: 1-2.  Again, plaintiff complained to her union and was told that since she was getting the same pay, there was no demotion.  See Exhibit "B" at 79: 15-18.

61.     Plaintiff testified that in mid-2004 when her unit was asked to stuff envelopes, she filed a grievance claiming that she was performing work outside of her title.  See Exhibit "B" at 84: 10-13.  Plaintiff's grievance went to DOF's Labor Relations but during the process, plaintiff's Union representative advised her that she was going to be transferred to another unit to resolve plaintiff's grievance and that her new supervisor would be a PAA II.  See Exhibit "T" at 85: 10-15.  This ended plaintiff's grievance.  See Exhibit "B" 85: at 225; 86: at 1; see also Exhibit "T."

62.     On or about December 6, 2004, plaintiff remained in the same Manhattan DOF office of the City Register but was transferred to the Title Research Unit.  See Exhibit "B" at 86: 16-22; see also Exhibit "T."    Plaintiff's job duties included conducting title searches for In-Rem and other agency contract searches, utilizing data received at the city registers county clerks offices and all Court Houses in all boroughs, retrieving and returning all sources used in

conducting a title search, ensuring that all of the DOF file as are correct and performing special projects as assigned by a supervisor. See Exhibit "B" at 87: 4-8; see also Exhibit "U." Plaintiff believed that her work was below her title but acknowledged that her salary did not change. See Exhibit "B" at 87: 8-9, 21-23. Plaintiff believed that an unidentified Clerical Associate employee who was just called off of a PAA list had been doing similar duties. See Exhibit "B" at 87: 8-12.

63.    Plaintiff did not believe that David Sanchez, her new supervisor, knew about her prior confidential interview with the EEO office or that she filed a complaint with the NYS Division of Human Rights. See Exhibit "B" at 87: 24-25; 88: 25; 89: 1-4.

64.    On or about February 4, 2005 and when plaintiff was asked to do some filing plaintiff filed another out-of-title grievance. See Exhibit "B" at 89: 14; 90: 13-21; see also Exhibit "V." Plaintiff claimed that she was performing work beneath her title. Id.   DOF Labor Relations met with the Union to find a PAA I assignment to resolve her grievance. See Exhibit "V" at 91: 5-9.   During the grievance procedure, plaintiff was advised, and plaintiff acknowledged that she was aware that she could be assigned to any DOF location throughout New York City. See Exhibit "B" at 93: 21-24; 95: 2-6.

65.    In early June 2005, plaintiff was advised by her union that she was going to be transferred to Queens to work in a position in her same title, PAA I. See Exhibit "W."

66.    Plaintiff went on vacation around June 25, 2005. See Exhibit "B" at 91: 8-18, 24.   Plaintiff claimed that she suffered from depression and was "afraid to go back to work." See Exhibit "B" at 92: 14-16.

67.    On July 1, 2005, Ms. Richards-Byers went out on an approved medical leave and was scheduled to return to work on December 19, 2005. See  Exhibit "X." Ms.

Richards-Byers failed to return to work on December 19, 2005 and was placed on an unauthorized leave status and was considered Absent Without Leave ("AWOL"). Ms. Richards-Byers remained on AWOL status for approximately eighteen months until she returned to work on August 19, 2007. Id.

68.     On or about March 1, 2007, DOF's Department Advocate served Ms. Richards-Byers with disciplinary charges based on plaintiff's unauthorized leave. See Exhibit "X." During the disciplinary proceeding, and on September 17, 2007, a Stipulation of Settlement was entered in to in which Ms. Richards-Byers conceded that she was guilty of having been Absent Without Leave as of November 1, 2006. Ms. Richards-Byers was suspended without pay from September 18, 2007 until December 26, 2007, was given an official reprimand and placed on an eighteen month probationary period. Id.

69.     Ms. Richards-Byers returned to work from her suspension on December 16, 2007 and then went on leave again for a medical disability as of September 14, 2008 and has not returned to work to date, although she is scheduled to return on November 4, 2008. See Exhibit "X."

## E.     Plaintiff's Allegations That Defendants Failed to Promote Fail As A Matter Of Law.

70.          Plaintiff claims that subsequent to her complaints concerning harassment, plaintiff's applications for promotions were denied. See Exhibit "A." at ¶ 38.

71.          Plaintiff testified in her deposition that in January 2006, she applied for a job as a parking Summons Clerk but received a letter in February 7, 2007, stating that she did not receive the position. See Exhibit "B" at 103: at 18-24; see also Exhibit "Y." Plaintiff was advised in the letter, dated February 7, 2005, that there was an extremely large response to the posting from highly qualified candidates and that she unfortunately, was not selected for the position.. See Exhibit "Z." Plaintiff also claims that in October 2004, she failed

to obtain a position as a PAA, Level I position in the Adjudication - Official Business Defense Unit.  See Exhibit "AA"; see also Exhibit "B" at 104: 13-20.  However, plaintiff cancelled her second scheduled interview for this position, which was to take place on March 24, 2005, and was thus no longer considered for the position.  Moreover, this position would have been a lateral move for plaintiff.  See Exhibit "BB."

F.   **Plaintiff's Charge of Retaliation and Harassment Filed With The New York State Division of Human Rights.**

72.   On January 22, 2004, plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") alleging retaliation and harassment.  See Exhibit "B" 82: at 7-11; see also Exhibit "M."

73.   On or about March 24, 2004, the DOF submitted an answer to plaintiff's complaint, which denied any retaliatory action or adverse action against plaintiff.  See Exhibit "S."  Then Acting City Register, Annette Hill submitted an affidavit acknowledging plaintiff's transfer to Manhattan on or about February 2, 2004.  Ms. Hill stated that the transfer was due to a need for an additional person to work on the helpline and the belief that plaintiff's abilities were well suited to answering inquiries from the public.  Plaintiff received the same training handouts as other employees, although there was no formal training at the City Register's Office.  Ms. Hill also stated that she had no prior knowledge of plaintiff's participation in any protected activities. Id.

74.   Additionally, EEO Officer, Annie Long acknowledged that she spoke to plaintiff during a confidential interview on August 6, 2002.  Id.  Then on September 3, 2003, plaintiff came to her office alleging facts and circumstances more than a year prior that did not appear to have any EEO basis.  Ms. Long advised plaintiff to speak to the DOI.  Plaintiff also stated to her

that she welcomed the transfer to the City Register because  previous assignment was being phased out and she did not have much work to do. Id.

75.     The NYSDHR found No Probable cause and issued a Determination and Order after Investigation. See Exhibit "CC." The NYSDHR found that there was insufficient evidence to support a claim that DOF retaliated against plaintiff due to her opposition to discrimination. The NYSDHR dismissed plaintiff's complaint. See Exhibit "CC."

76.     The United States Equal Employment Opportunity Commission issued a right to sue letter on September 2, 2005. See Exhibit "DD."

77.     On or about October 3, 2005, plaintiff commenced the instant federal lawsuit.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court issue an order granting summary judgment and dismissing plaintiff's complaint in its entirety, and such other and further relief as the Court deems just and proper.

Dated:       New York, New York
             October 29, 2008

                        MICHAEL A. CARDOZO
                        Corporation Counsel of the
                         City of New York
                        Attorney for Defendants
                        100 Church Street
                        New York, New York 10007
                        (212) 788-8685
                        cbarnett@law.nyc.gov

                    By:  _____
                         Camille D. Barnett
                         Assistant Corporation Counsel